UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
JARRETT FROST

          Plaintiff,

     - against -

THE CITY OF NEW YORK, et al.

         Defendants.
------------------------------------X

**MEMORANDUM AND ORDER**

15 Civ. 4843 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    Plaintiff Jarrett Frost brings this action pursuant to 42 U.S.C. § 1983 and New York common law after a jury acquitted him of all charges in connection with the murder of Mavon Chapman. After dismissing all claims under three causes of action and against one named defendant,[1] plaintiff now asserts thirteen causes of action against the City of New York ("NYC"), three members of the New York Police Department ("NYPD officers"),[2] and 17 officers of the Department of Correction ("DOC officers")[3] based on (1) alleged malicious prosecution by NYPD officers and (2) alleged use of excessive force by DOC officers while Frost was incarcerated.

---

[1] See Stipulation of Partial Dismissal and Withdrawal with Prejudice Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) ("Stipulation"), ECF No. 76. Plaintiff dismissed with prejudice claims under his first, sixth, and tenth causes of action. Plaintiff also dismissed with prejudice all claims against defendants Correctional Officer Thomas, Detectives John Doe #1-2, and Correction Officers John Does #1-5. Id. ¶¶ 1-3, 7, 9.

[2] The three NYPD officers are defendants Spennicchia, O'Neil and Lopuzzo.

[3] The 17 DOC officers are defendants McDuffie, Ryan, Jemmott, Torres, Soria, Carty, Souffrant, Tatulli, Previllon, Gonzales, Young, McLaughlin, Barksdale, Corker, Sanchez, Hill, and Joye.

Since plaintiff asserts each cause of action against different combinations of defendants, we list below each cause of action and defendants against whom the cause of action is asserted in order to avoid any confusion:

Count 2: Deprivation of rights under the U.S. Constitution and 42 U.S.C. § 1983 against Lopuzzo, McDuffie, Ryan and Jemmott;[4]

Count 3: Use of excessive force by DOC Officers with respect to Municipal Liability against NYC;[5]

Count 4: Violation of substantive due process rights against all individual defendants;[6]

Count 5: Malicious prosecution against NYC, Spennicchia, O'Neil, and Lopuzzo;

Count 7: Battery against NYC, McDuffie, Soria, Carty, Souffrant, Tatulli, and Previllon;[7]

Count 8: Assault against NYC, McDuffie, Soria, Carty, Souffrant, Tatulli, and Previllon;[8]

Count 9: Excessive force against all DOC officers except for Gonzalez;

Count 11: Dereliction of duty, depraved indifference, and failure to intercede against all DOC officers;[9]

Count 12: Negligence against all defendants;

Count 13: Negligent hiring against defendant NYC;

Count 14: Negligent infliction of emotional harm against all defendants;

Count 15: Intentional infliction of emotional harm against all defendants; and

Count 16: Monell liability against NYC.

---

[4] Plaintiff dismissed Count 2 as against NYC, Spennicchia, O'Neil, Torres, Soria, Carty, Souffrant, Tatulli, Previllion, Gonzalez, Young, McLaughlin, Barksdale, Corker, Sanchez, Hill, and Joye. Stipulation ¶ 4.

[5] Plaintiff dismissed Count 3 as against all individual defendants. Id. ¶ 5.

[6] Plaintiff dismissed Count 4 as against NYC. Id. ¶ 6.

[7] Plaintiff dismissed Count 7 as against Gonzalez. Id. ¶ 8.

[8] Plaintiff does not explicitly dismiss Count 8 as against Gonzales but does not list Gonzalez as a defendant for Count 8. Id. ¶ 11(f).

[9] Plaintiff dismissed Count 11 as against NYC. Id. ¶ 10.

Defendants move for summary judgment against all of plaintiff's claims. Since plaintiff cannot maintain any cause of action against NYC without establishing an underlying claim based an individual defendant's action, we assess the state of the record "to determine whether there is a genuine issue to be tried" as to claims asserted against individual defendants. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010). For the reasons stated below, we find that plaintiff has failed to establish his federal claims against any individual defendant and grant defendants' motion for summary judgment.

## BACKGROUND[10]

We begin with undisputed facts related to plaintiff's initial arrest and prosecution before turning to undisputed facts related to four incidents of alleged use of excessive force by DOC officers while plaintiff was incarcerated in Rikers Island.

## I. Alleged Malicious Prosecution by NYPD Officers

Mavon Chapman was shot and killed on July 6, 2010, at or around 3:55 a.m. on the corner of Morris Avenue and East 149th Street in the Bronx. Defs.' 56.1 Stmt. ¶ 3, ECF No. 80.[11] On the day of the murder, Frost was residing in an apartment complex at

---

[10] The following facts are taken from the parties' Local Rule 56.1 Statements, declarations, and exhibits. Our citations to the 56.1 statements also incorporate by reference the documents and testimony cited therein.

[11] Plaintiff's counsel failed to comply with the Court's Individual Rules of Practice by not reproducing each entry of defendants' 56.1 Statement in the counter-statement. Consequently, we provide parallel citations to both parties' 56.1 Statements only if the statement is disputed by the parties.

225 East 149th Street in the Bronx ("apartment complex"), which is located one block from where Chapman was shot. Id. ¶¶ 4-6. The day before the murder, Frost and his friend were assaulted by a neighborhood gang in front of the apartment complex. Id. ¶ 7. The gang included non-parties Leon Vega and Tjon Macall. Id. ¶ 8. Frost was interviewed by non-party Detective Burgos about the assault within a day of the assault. Id. ¶¶ 12-13.

Detectives Spennicchia and O'Neil interviewed six witnesses, including Vega and Macall, who were within the vicinity of Morris Avenue and East 149th Street at the time of the murder. Id. ¶ 21. Based on the interviews and two .380 caliber shell casings found under the passageway of the apartment complex, the detectives came to believe that the shots that had killed Chapman came from a doorway leading to the apartment complex's stairwell. Id. ¶¶ 24-31. The detectives reviewed surveillance video from cameras located inside the lobby and the stairwell of the apartment complex, which showed two individuals coming down and then running back up the stairwell at the time of the murder. Id. ¶¶ 33-39. Detective Burgos identified one of the individuals as Frost. Id. ¶ 40. On July 7, 2017, Detectives Spennicchia and O'Neil interviewed Frost, who admitted that he was in the stairwell with non-party John McLaurin. Id. ¶¶ 44-49, 59. Frost also informed the detectives and an Assistant District Attorney ("ADA") that, while he was with McLaurin in the staircase, he saw McLaurin with

a gun after he heard gunshots.[12]   Id. ¶ 61-62; Pl.'s 56.1 Counter-Stmt. ¶ 62, ECF No. 113.

On January 6, 2011, Vega, who had been arrested for an unrelated crime, wanted to enter into a cooperation agreement with the Bronx District Attorney's Office in exchange for information he had about Chapman's murder.[13]   Defs.' 56.1 Stmt. ¶ 72. Accompanied by his criminal defense attorney, Vega was interviewed by an ADA at the District Attorney's Office and identified Frost as the shooter from a photo array.[14]   Id. ¶ 74-76; Pl.'s 56.1 Counter-Stmt. ¶ 75-76.  Vega also identified McLaurin from a photo array as the individual who was with Frost at the time of the murder.  Defs.' 56.1 Stmt. ¶ 78.  On January 9, 2011, Detectives Spennicchia and O'Neil interviewed McLaurin after advising him of his Miranda rights.  Id. ¶¶ 79-81.  During the interview, McLaurin stated that he was with Frost in the staircase and identified Frost as the shooter.  Id. ¶¶ 84-94; Pl.'s 56.1 Counter-Stmt. ¶¶ 84-95. McLaurin also provided an audio statement to an ADA.  Defs.' 56.1 Stmt. ¶ 95.

---

[12] After initially saying that he first saw McLaurin with a gun after the shots, Frost then clarified that he saw McLaurin "make a motion" into his left pocket as if he were "reaching for something."  Pl.'s 56.1 Counter-Stmt. ¶ 62.

[13] During his initial interview with the police on July 6, 2010, Vega stated that he did not see or know who shot Chapman.  Defs.' 56.1 Stmt. ¶ 23.

[14] In a declaration dated September 12, 2018, Vega states for the first time that he falsely identified Frost as the shooter under duress from Detectives Spennicchia and O'Neil.  See Decl. of Leon Vega, ECF No. 111-1, ¶¶ 13-18.  As discussed infra, we find that Vega's eleventh hour declaration does not create a genuine issue of fact.

Based on Vega's and McLaurin's statements, the Bronx District Attorney's Office authorized the arrest of Frost.  Id. ¶¶ 96-97; Pl.'s 56.1 Counter-Stmt. ¶¶ 96-97.  On January 13, 2011, Frost was arrested on charges of: (1) Murder in the Second Degree, N.Y.P.L. § 125.25(1); (2) Manslaughter with Intent to Cause Physical Injury, N.Y.P.L. § 125.20(1); (3) Criminal Possession of a Weapon in the Second Degree: Loaded Firearm, N.Y.P.L. § 265.03(1); and (4) Criminal Procession of a Weapon in the Second Degree: Loaded Firearm, N.Y.P.L. § 265.03(3).  Defs.' 56.1 Stmt. ¶ 98.  On February 1, 2011, Frost was indicted by a grand jury on the four charges.  Id. ¶ 100.  The New York Supreme Court, Bronx County, found that the evidence before the grand jury was legally sufficient in all respects.  People v. Frost, Indictment No. 00473-2011, Feb. 3, 2012 Decision & Order (N.Y. Sup. Ct. 2012).  On June 24, 2014, Frost was found not guilty of all charges after a jury trial.[15]  Defs.' 56.1 Stmt. ¶ 102.

## II.  Alleged Use of Excessive Force by DOC Officers

Plaintiff alleges four specific incidents during which he asserts that DOC officers used excessive force.[16]  We recite the undisputed facts related to each incident in chronological order.

---

[15] There is no allegation that the delay between plaintiff's arrest and trial is attributable to any defendant.

[16] Plaintiff's amended complaint recites seven incidents. However, plaintiff does not assert any claim premised on the first three incidents that allegedly took place on (1) May 16, 2011, (2) November 10, 2011, and (3) February 15, 2012, apparently recognizing that the three-year statute of limitations for a § 1983 action had expired for the three incidents by the time plaintiff filed his complaint on June 22, 2015.  See Dory v. Ryan, 999 F.2d 679, 681 (2d Cir.

## A. July 25, 2012 Incident

On July 25, 2012, plaintiff was scheduled to appear in the Manhattan Criminal Court. Id. ¶ 128. Plaintiff, who had been designated as a RED ID inmate,[17] was waiting for his scheduled court appearance in a cell on the 12th floor of the courthouse, id. ¶ 127, when he got into a physical fight with another inmate, Jason Skinner, id. ¶ 132. Defendant Officer Torres, who was assigned to work at the 12th floor RED ID cell on the day of the incident, id. ¶ 123, and his partner, Officer Thomas, both told plaintiff and Skinner to stop fighting and entered the cell. Id. ¶ 135-36. Plaintiff and Skinner stopped fighting, and Officers Torres and Thomas separated them. Id. ¶¶ 136, 138. Officer Thomas noticed that Skinner was bleeding from lacerations on his face and thigh. Id. ¶ 140; see also Defs.' Ex. U, ECF No. 78-21, Bates No. DEF 1564. In light of Skinner's injuries, Officers Torres and Thomas searched plaintiff and the cell for a shank, but the officers did not discover any weapon. Id. ¶¶ 141, 144.

---

1993) ("The statute of limitations for actions under § 1983 is the statute of limitations applicable to personal injuries occurring in the state in which the appropriate federal court sits... . In New York State, the applicable statute of limitations for personal injuries is three years.") (internal citations omitted). Plaintiff's pleading is inconsistent in recognizing the time bar of the first three incidents.

[17] A RED ID classification is given to inmates who have engaged in assaultive behavior. See Defs.' 56.1 Stmt. ¶ 125; Pl.'s 56.1 Counter-Stmt. ¶ 125. RED ID inmates wear RED ID restraints and handcuffs. See Defs.' 56.1 Stmt. ¶ 126. Plaintiff was given RED ID status after he "was involved in a use of force" with several non-party corrections officers and non-party inmates on February 15, 2012. Id. ¶¶ 118, 120. Plaintiff was later found guilty of six counts of obstructing governmental administration related to that incident, but was acquitted of assault charges. Id. ¶ 122; Pl.'s 56.1 Counter-Stmt. ¶ 122.

During the fight, plaintiff's prescription glasses fell off.[18]
Id. ¶¶ 152-53. After the fight, plaintiff asked Officer Torres
for his glasses. Id. ¶ 154. Officer Torres located the glasses
on the floor and noticed that they were damaged. Id. ¶ 155-56;
Pl.'s 56.1 Counter-Stmt. ¶156.[19] Officer Torres handed the glasses
back to plaintiff but intentionally further broke the glasses in
the middle of the frame. Defs.' 56.1 Stmt. ¶ 157-58.

Plaintiff received medical attention after the incident but
did not request new glasses at that time. Id. ¶ 159. Plaintiff
requested new glasses on August 16, 2012 and received them on
September 22, 2012. Id. ¶¶ 160-61.

B. October 9, 2012 Incident

On October 9, 2012, plaintiff was brought to the Bronx Supreme
Court for an attorney visit. Id. ¶ 164. Defendant Captain Jemmott
was assigned as Search Captain and was tasked with searching
inmates and transporting them back to their respective facilities

---

[18] Plaintiff was given prescription glasses by a Department of Corrections optometrist about a month earlier on June 22, 2012. Defs.' 56.1 Stmt. ¶ 152.

[19] Officer Torres stated that, when he picked up the glasses, the right lens was broken and the frame was cracked at the bottom of the lens on the right side. Defs.' 56.1 Stmt. ¶ 156; Defs.' Ex. H (Torres Deposition), ECF No. 78-8, Tr. 69:12-20. Plaintiff disputes this statement and cites several pages of the transcript from plaintiff's deposition. See Pl.'s 56.1 Counter-Stmt. ¶ 156. However, plaintiff stated during his deposition: "So when I looked at my glasses . . . I realized they had been broken and damaged." Pl.'s Ex. A ("Frost Deposition"), ECF No. 110, Tr. 186:6-8. Although plaintiff did not describe the extent of the damage, his statement does not contradict Officer Torres's statement that the glasses were damaged during plaintiff's altercation with Skinner. Since plaintiff does not "point to any evidence in the record that may create a genuine issue of material fact," plaintiff's 56.1 statement "will be deemed [an] admission[] of the stated fact." Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 458 n.1 (S.D.N.Y. 2011).

after their court appearances. Id. ¶ 163. Defendant Officer Joye was also present at the courthouse. Id. ¶ 170. Plaintiff complained to an unidentified officer that it was difficult to breathe in the booth area, and he was subsequently brought towards an empty pen in the intake area by Captain Jemmott. Id. ¶¶ 165-66. While in transit, plaintiff told Captain Jemmott that he would spit on Jemmott's face.[20] Id. ¶ 171; Pl.'s 56.1 Counter-Stmt. ¶ 171. Captain Jemmott then took plaintiff to the ground and held his face. Id. ¶ 172. Officer Joye used his knee to keep plaintiff's legs down, and one of the two officers kicked plaintiff in the ribs. Id. ¶¶ 173-74. Plaintiff was dragged across the ground by Captain Jemmott and Officer Joye. Id. ¶ 175.

Plaintiff was taken to the medical clinic on the same day, and he complained of mild hearing loss in his right ear. Id. ¶¶ 177-79. The next day, plaintiff was diagnosed with bruises on the right side of his forehead and right cheekbone, as well as a ruptured right eardrum. Id. ¶ 181. Plaintiff was given Motrin for these injuries. Id. ¶ 184.

### C. January 16, 2013 Incident

On January 16, 2013, plaintiff was housed on the first floor of the Central Punitive Segregation Unit ("CPSU"). Defs.' 56.1

---

[20] Regarding his alleged threat, plaintiff stated: "I don't recall saying that, but – I never spit in his face, but if I was mad, I possibly did." Frost Deposition, Tr. 265:23-24. This type of response does not function as a denial "and will be deemed [an] admission[] of the stated fact." Senno, 812 F. Supp. 2d at 458 n.1.

Stmt. ¶ 189.  Defendant Captain Ryan was assigned to the CPSU as the supervisor of the fourth floor, defendant Officer McLaughlin was assigned to the CPSU as a second floor escort, and defendant Officer Hill was assigned to the CPSU Intake 3-point search area. Id. ¶ 186-193.  Defendant Officer Hill initiated a strip search of plaintiff after plaintiff returned from court.  Id. ¶¶ 196-98.

The parties' accounts of what followed diverge.  Defendants' version is as follows.  Defendant Officer Hill was notified by his supervisor, Deputy Warden Ramos, that plaintiff was secreting an object in his anal cavity.  Id. ¶ 203.  Plaintiff turned over a contraband bag of cheese to defendant Officer Hill but refused to turn over a second contraband object despite several direct orders that he do so.  Id. ¶¶ 200-201.  Defendant Captain Ryan was tasked with conducting an extraction of the second object from plaintiff's anal cavity.  Id. ¶ 204.  Captain Ryan assembled an extraction team that consisted of himself, Officers Young, McLaughlin, Barksdale, Corker, Sanchez, and non-party Officer Stowers.  Id. ¶ 207.  In preparation for the extraction, Captain Ryan obtained plaintiff's profile from the security office.  Id. ¶ 208. Plaintiff's profile revealed he was a RED ID inmate, was designated as an "Intended Contraband Recipient," had enhanced restraint status, was a member of the Bloods gang, had a record of assaulting staff, was previously caught with a weapon, and had either one or two infractions for fighting with inmates.  Id. ¶ 209.  Defendants

Ryan and Hill tried to convince plaintiff to turn over the remaining contraband, but they were unsuccessful. Id. ¶¶ 215-16. Plaintiff was subsequently moved from the CPSU intake search area. Id. ¶ 222; see also Def's Ex. V, ECF No. 78-22, Bates No. DEF 1725 (Handheld Video of Jan. 3, 2013 Incident) ("Video of the Extraction Incident"). Immediately prior to the extraction, plaintiff kept his left hand in the cuffing port to prevent Captain Ryan from opening the door, spit on him, and attempted to grab pepper spray from him. Id. ¶¶ 223-225. Immediately prior to the extraction, Captain Ryan pepper sprayed plaintiff twice, ordered plaintiff to remove the contraband and release his arm from the cell, and ordered defendant Officer McLaughlin to remove plaintiff's arm from the cuffing port. Id. ¶¶ 227, 229, 231. Plaintiff's arm was removed from the cuffing port, and two members of the extraction team entered the search area. Id. ¶¶ 232, 234.

Plaintiff threw punches at the officers as they entered the search area while plaintiff attempted to exit the search area. Id. ¶ 235. Plaintiff was ordered to stop resisting but failed to do so. Id. ¶¶ 238, 240-241. The officers grabbed plaintiff's arm and took him to the ground. Id. ¶ 237. One officer applied leg shackles while another officer applied handcuffs and plaintiff was subsequently lifted to his feet and brought to the three-point search area. Id. In the search area, Captain Ryan ordered plaintiff to squat, but he refused to squat and instead lunged

towards Ryan. Id. ¶¶ 246-247. Plaintiff eventually squatted as requested, and a piece of triangular metal wrapped in black electrical tape fell out of his rectum. Id. ¶ 250.

Plaintiff sustained some bruises during the extraction and was treated at the medical clinic with an ice pack and pain medication. Id. ¶¶ 252-253. He was subsequently arrested and indicted in connection with the incident. Id. ¶ 254. On December 1, 2014, plaintiff pled guilty to Promoting Prison Contraband in the Second Degree in satisfaction of the indictment issued in connection with the incident. Id. ¶ 255; Defs.' Ex. V (Certificate of Disposition on Jan. 16, 2013 incident), ECF No. 78-22.

Plaintiff's account of the January 16, 2013 incident differs from defendants' account in the following ways. Plaintiff admits that he had a bag of cheese in his possession but denies that he had any other object in his possession. See Pl.'s 56.1 Counter-Stmt. ¶ 198; Pl.' Ex. A (Frost Deposition), Tr. 273:4-273:21. Plaintiff asserts that the metal contraband was planted on him by Captain Ryan. Pl.'s 56.1 Counter-Stmt. ¶¶ 197-198, 200, 221, 229-230. Plaintiff disputes that he was secreting anything in his anal cavity. Id. ¶ 203. Plaintiff also denies resisting officers during the extraction. Id. ¶ 238-240. Lastly, plaintiff admits to pleading guilty to promoting prison contraband but asserts he did so "to get the incident over with and move on without doing further jail time rather than because he was guilty." Id. ¶ 255.

D.  <u>July 16, 2013 Incident</u>

On July 16, 2013, Plaintiff was housed in "Housing Area 1 South" of the Central Punitive Segregation Unit ("CPSU"). Defs.' 56.1 Stmt. ¶ 258. Defendants McDuffie, Soria, and Previllon were all assigned to work at the recreation post of the CPSU that day. <u>Id.</u> ¶¶ 259-64. Plaintiff and eighteen other inmates were escorted to the recreation post around 6 a.m. on July 16, 2013. <u>Id.</u> ¶ 270. Nineteen inmates, including plaintiff, refused to leave the recreation yard at the end of their allotted hour. <u>Id.</u> ¶¶ 272-73. Defendant McDuffie and other officers spent approximately seven hours speaking with plaintiff and other inmates in an unsuccessful attempt to get them to come back inside. <u>Id.</u> ¶ 275. An extraction team was assembled to extract plaintiff. <u>Id.</u> ¶ 282. The extraction team consisted of defendants McDuffie, Soria, Previllon, Souffrant, Carty, Tatulli, Gonzales, and non-party Savage. <u>Id.</u> ¶ 283. When the extraction team arrived at plaintiff's pen, plaintiff was holding the gate with one hand and had ripped his orange clothing to make elbow pads and a mouth guard. <u>Id.</u> ¶ 284.[21] Plaintiff threw several punches at Officer

---

[21] Plaintiff asserts a blanket dispute to defendants' account of the July 16, 2013 incident. Pl.'s 56.1 Counter-Stmt. ¶¶ 284-296. Plaintiff's reply violates Federal Rule of Civil Procedure 56(c) in that it does not respond to each numbered paragraph and instead cites to several pages of plaintiff's deposition without clarifying which statements of fact are in dispute. Regardless, we need not credit assertions that "are flatly contradicted by the video evidence." <u>Hicks v. Vill. of Ossining</u>, No. 12-cv-6874 (VB), 2016 WL 345582, at *5 (S.D.N.Y. Jan. 27, 2016). Here, video footage of the incident of the incident clearly corroborates defendants' factual assertions. <u>See</u> Defs.'

Soria and Soria subsequently lost his balance and fell to the ground.  Id. ¶ 287.  Plaintiff got on top of Officer Soria.  Id. ¶ 288.  It took three members of the extraction team approximately 40 seconds to remove plaintiff from Officer Soria.  Id. ¶ 290. Plaintiff was ordered to stop resisting during the extraction but persisted in resisting.  Id. ¶¶ 292-293.

Plaintiff was treated at the CPSU mini clinic on the same day for sustaining a black eye.  Id. ¶¶ 297-298.  Plaintiff also had mild abrasions and superficial contusions, was in "no apparent distress," and was given bacitracin and Tylenol to relieve pain. Id. ¶¶ 299-300.

## Procedural History

Plaintiff filed his complaint on June 22, 2015 and the operative amended complaint on February 5, 2016.  See ECF Nos. 1, 21.  After a very prolonged discovery period due to plaintiff's utter failure to prosecute the case on a timely manner, see Letter from the Court to Ellie A. Silverman, Apr. 19, 2018, ECF No. 67, the discovery period ended on March 31, 2018, and defendants moved for summary judgment on July 10, 2018, see ECF No. 77.

Plaintiff's answering brief was due August 28, 2018.  See ECF No. 70.  However, plaintiff's counsel, Ellie A. Silverman, sought an extension of the deadline until September 14, 2018, based on

---

Ex. W, ECF No. 78-23 (Handheld Video of Jul. 16, 2013 Incident) ("Video of the Recreation Post Incident").

"the unforeseen lack of attorney coverage" at her law firm, and we granted the request.  See ECF No. 87.  The day before the extended deadline, Ms. Silverman informed the Court that the sole principal of her law firm, Ilya Novofastovsky, had been suspended from the practice of law and, given the numerous ethical issues that the suspension raised, asked for another adjournment of the deadline. See Letter from Ellie A. Silverman to the Court, Sep. 13, 2018, ECF No. 88.  We granted plaintiff a 30-day extension "to file answering papers to the pending summary judgment motion either pro se or by counsel."  Sep. 18, 2018 Order, ECF No. 95.

Ms. Silverman informed the Court that plaintiff "wanted [Ms. Silverman] to continue representing him."  See Letter from Ellie A. Silverman to the Court, Oct. 16, 2018, ECF No. 96.  She also asked for a brief stay on all motion practice until Mr. Novofastovsky turned over plaintiff's physical and electronic files to her.  Id.  We ordered Ms. Silverman to submit the answering brief within three weeks of receiving the files "but in no event later than December 3, 2018."  ECF No. 97.  After learning that Mr. Novofastovsky was ignoring her requests, see ECF No. 98, we issued an order to show cause "as to why he, as a suspended lawyer who was terminated as plaintiff's counsel, was entitled to place conditions on the transfer of the files and/or retain the files," Dec. 6, 2018 Order, ECF No. 105.  Mr. Novofastovsky then delivered the files to Ms. Silverman.  Subsequently, plaintiff filed his

answering brief on January 18, 2019,[22] and defendants filed their reply brief on February 19, 2019.[23]

## Discussion

### I.  Motion for Summary Judgment

Summary judgment is granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A fact is material when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (citations and internal quotation marks omitted).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997).

---

[22] Plaintiff submitted for this Court's consideration a recent opinion by the Eastern District of New York in Hamilton v. City of New York, 15-cv-4574 (CBA).  See Letter from Ellie A. Silverman to the Court, Mar. 25, 2019, ECF No. 127.  However, we find that the facts in that case are readily distinguishable from those before this Court, and that the opinion is thus not relevant.

[23] On the same day they filed their reply brief, defendants filed a letter seeking a pre-motion conference to exclude plaintiff's proposed expert report by Joseph Pollini as both untimely and inadmissible under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  See Letter from Nicholas Manningham to the Court, Feb. 19, 2019, ECF No. 125.  Given our resolution of the summary judgment motion, we need not reach defendants' potential motion.  However, even a cursory review of the report makes clear that the motion would have been granted.

"The moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" <u>F.D.I.C. v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." <u>Jaramillo v. Weyerhaeuser Co.</u>, 536 F.3d 140, 145 (2d Cir. 2008). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and "may not rely on conclusory allegations or unsubstantiated speculation." <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d Cir. 2005) (internal citations and quotation marks omitted).

## II. Malicious Prosecution (Count 5)

To state a § 1983 claim analogous to a state law malicious prosecution claim, plaintiff must not only establish the four elements of the state law claim,[24] but he must also demonstrate "a violation of [his] right under the Fourth Amendment to be free from unreasonable seizure." <u>Lanning v. City of Glens Falls</u>, 908 F.3d 19, 28 (2d Cir. 2018). Defendants challenge two of the five

---

[24] To state a malicious prosecution claim under New York law, plaintiff must show: "(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in plaintiff's favor." <u>Cameron v. City of New York</u>, 598 F.3d 50, 63 (2d Cir. 2010) (quoting <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir. 1997)).

elements: that defendants initiated a prosecution against
plaintiff and that they did so without probable cause to believe
that the prosecution could succeed.[25]

While police officers do not generally "commence or continue"
criminal proceedings against defendants, a claim for malicious
prosecution can still be maintained against a police officer if
the officer either (1) created false information and forwarded it
to prosecutors or (2) withheld relevant and material information.
See Mitchell v. Home, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006).
Defendants argue that they, as a matter of law, were not the
initiators of proceedings against Frost because they did "no more
than disclose to a prosecutor all material information within
[their] knowledge." Husbands ex rel. Forde v. City of New York,
No. 05-cv-9252 (NRB), 2007 WL 2454106, at *9 (S.D.N.Y. Aug. 16,
2007), aff'd, 335 F. App'x 124 (2d Cir. 2009) (internal citation
and quotation marks omitted). We agree.

Plaintiff's malicious prosecution claim is premised on
Vega's September 12, 2018 declaration in which Vega asserts that
Detectives Spennicchia and O'Neil allegedly forced him into
identifying Frost as the shooter.[26] See Decl. of Leon Vega ¶¶ 13-

---

[25] Defendants also challenge the "malice" element. However, at the summary
judgment stage, "actual malice can be inferred when a plaintiff is prosecuted
without probable cause." Rentas v. Ruffin, 816 F.3d 214, 221-22 (2d Cir. 2016).
Therefore, any finding of malice hinges on our probable cause analysis.

[26] Vega also asserts that he "refused to testify against [Frost] because
[he] did not want to continue to lie." Decl. of Leon Vega ¶ 20. However, Vega
was in fact called as a witness and testified at trial. See Transcript of Trial
at 181-206, People v. Frost, Indictment No. 00473-2011 (N.Y. Sup. Ct. 2014).

18

18.    The scant, three-page declaration - which was signed more than three years after plaintiff and his counsel filed this instant action, six months after the discovery period concluded, and two months after defendants filed their summary judgment motion - omits the undisputed and determinative fact that Vega's attorney and an ADA were present at his interview with the detectives.  <u>See</u> Defs.' 56.1 Stmt. ¶ 74.  As defendants argue, Vega's assertion, if true, would "mean that the two attorneys present during the interview, in violation of their ethical and legal obligations, condoned, countenanced and permitted the detectives to coerce Vega into testifying falsely."  Reply Mem. Law in Supp. of Defs.' Mot. Summ. J., ECF No. 124, at 4.  Vega's naked, uncorroborated assertion that he was forced to identify Frost as the shooter after given a photo array in the presence of his criminal defense attorney is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit" his allegation.  <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 551 (2d Cir. 2005).  <u>See also</u> <u>Blake v. Race</u>, 487 F. Supp. 2d 187, 203 (E.D.N.Y. 2007) (holding that, although the Second Circuit in <u>Jeffreys</u> declined to credit the plaintiff's own testimony, the Circuit's reasoning could apply with equal force to a non-party witness's testimony if the testimony is "so fanciful

_____

At trial, Vega repeatedly claimed lack of memory and, most significantly, did not take the opportunity to recant his original statements to the ADA in the presence of his counsel and Detectives Spennicchia and O'Neil.

and lacking in any corroboration that it [is] insufficient to create an issue of fact").

Assuming _arguendo_ the veracity of Vega's declaration, we still find that no genuine issue of material fact exists as to whether defendants "misled or pressured [the prosecutor] who could be expected to exercise independent judgment." Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999). As the undisputed facts show, prosecutors from the Bronx District Attorney's Office were present when Frost, Vega, and McLaurin made their statements. See Defs.' Ex. O, ECF No. 78-15, Bates No. DEF 4674 (stating that ADA Bijra-Koessler was present when Frost made his stenographic statement); _id._ Bates No. DEF 4744 (stating that ADA Baumgardner was present when McLaurin made his audio statement); Defs.' 56.1 Stmt. ¶ 74 (stating that an ADA was present during Vega's interview). After evaluating those statements, the District Attorney's Office made the decision to arrest Frost. See Dep. of Michael Lopuzzo, ECF No. 78-7, Tr. 90:13-17. Thus, the prosecutors used their independent judgment to prosecute Frost, which breaks the chain of causation with respect to any potential liability of the officers for the prosecution. See Townes, 176 F.3d at 147.

Furthermore, there was probable cause to arrest and prosecute plaintiff for each of the charges set forth in the indictment. First, "there is a presumption of probable cause created by the fact that a grand jury" indicted Frost. Bermudez v. City of New

<u>York</u>, No. 11-cv-750 (LAP), 2014 WL 11274759, at *10 (S.D.N.Y. Mar. 25, 2014). Second, it is undisputed that: (1) the shots that killed Chapman came from a doorway leading to the stairwell inside the apartment complex; (2) plaintiff was in the stairwell at the time of the murder; (3) he had a motive to retaliate against the neighborhood gang; and (4) McLaurin identified plaintiff as the shooter. Thus, even without Vega's statement, NYPD officers and the prosecutor had "knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause" for all of Frost's four charges.[27] <u>Zellner v. Summerlin</u>, 494 F.3d 344, 369 (2d Cir. 2007).

## III. Excessive Force (Count 9)

A pretrial detainee bringing excessive force claims must show "that the force purposely or knowingly used against him was objectively unreasonable." <u>Kingsley v. Hendrickson</u>, 135 S. Ct. 2466, 2473 (2015). "[O]bjective reasonableness turns on the facts and circumstances of each particular case. A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." <u>Id.</u> In determining whether force was objectively reasonable, we may consider factors such as: "the

---

[27] Since we find that defendants had probable cause to prosecute plaintiff and did not "commence the criminal proceeding due to a wrong or improper motive," we also find that no genuine issue of fact exists regarding whether defendants acted with malice. <u>Lowth v. Town of Cheektowaga</u>, 82 F.3d 563, 573 (2d Cir. 1996).

relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973). For plaintiff's excessive force claims to survive summary judgment, Frost must "allege that the officers used more than de minimis force." Feliciano v. Thomann, 747 F. App'x 885, 887 (2d Cir. 2019).

A.    July 25, 2012 Incident

Plaintiff's excessive force claim related to the July 25, 2012 incident stems from the intentional breaking of his prescription eyeglasses by defendant Officer Torres. As a matter of law, "plaintiff's allegations that defendants intentionally destroyed his glasses ... do not state a claim for relief under § 1983. Intentional, unauthorized deprivations of property by prison officials cannot be redressed pursuant to § 1983 if 'adequate state post-deprivation remedies are available.'" Muhammad v. McMickens, No. 86-cv-7376 (SWK), 1988 WL 7789, at *2 (S.D.N.Y. Jan. 25, 1988) (quoting Hudson v. Palmer, 468 U.S. 517,

533 (1984)).  In plaintiff's case, "state tort law causes of action [constitute] an adequate post-deprivation state remedy."  Alloul v. City of New York, No. 09-cv-7726 (JSR)(FM), 2010 WL 5297215, at *6 (S.D.N.Y. Dec. 21, 2010).

Moreover, no reasonable jury could conclude that the alleged deprivation of plaintiff's prescription glasses - when plaintiff did not expeditiously request replacement glasses and did not suffer any symptoms from not wearing prescription glasses - violated plaintiff's constitutional rights.  See Zigmund v. Solnit, 199 F.3d 1325 (2d Cir. 1999) ("[R]equirements of due process do not apply when the property interest involved is de minimis.") (citations and internal quotations omitted); see also Gardner v. Mental Health Unit of Sullivan Corr. Facility, No. 07-cv-5535 (WHP), 2009 WL 1834382, at *2 (S.D.N.Y. June 17, 2009) (deprivation that "does not endanger an inmate's health and safety" does not establish constitutional violation).  Accordingly, we grant defendants' motion for summary judgment as to plaintiff's excessive force claim arising from the July 25, 2012 incident.

B.  October 9, 2012 Incident

Plaintiff's excessive force claim related to the October 9, 2012 incident arises from alleged use of excessive force by several DOC officers after plaintiff stated that he would spit on Officer Jemmott's face.  In assessing the alleged use of excessive force, we must view the incident "from the perspective of a reasonable

officer on the scene, including what the officer knew at the time." Kingsley, 135 S. Ct. at 2473 (2015). By the time of the October 9, 2012 incident, plaintiff had been placed on RED ID status – status well-earned - as the result of a use of force against correction officers On February 15, 2012. Id. ¶ 120. Plaintiff had also already pled guilty to assault as the result of yet another use of force against a correction officer on May 16, 2011. Defs.' 56.1 Stmt. ¶¶ 105, 115. Just months earlier, during the July 25, 2012 incident, plaintiff had been involved in a fight with another inmate that resulted in "lacerations" on the other inmate's face and thigh that bled "a lot" and required medical attention. Id. ¶ 140.

In sum, plaintiff had established himself as a violent inmate whose threats against DOC officers needed to be taken seriously. Considering "the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained" and plaintiff's established history of violence, we find that, as a matter of law, defendants Captain Jemmott and Officer Joyce used objectively reasonable force to protect themselves from plaintiff's threat.[28] See, e.g., Coleman v. Hatfield, No. 13-cv-6519 (FPG), 2016 WL 2733522, at *3 (W.D.N.Y.

---

[28] Furthermore, the fact that plaintiff suffered relatively minor injuries in the course of his struggle with defendants "is not dispositive, [but] is nonetheless highly relevant to the reasonableness of the force applied." Johnson v. Police Officer #17969, No. 99-cv-3964 (NRB), 2000 WL 1877090, at *5 (S.D.N.Y. Dec. 27, 2000).

May 10, 2016) (dismissing an excessive force claim where plaintiff was taken to the floor by defendant after plaintiff "suddenly became non-compliant ... turned toward [defendant] and spit out an unknown object towards [defendant]."); Smolen v. Dildine, No. 11-cv-6434 (CJS), 2014 WL 3385209, at *8 (W.D.N.Y. July 9, 2014) (dismissing excessive force claim when plaintiff "seemingly began to spit" and was subsequently held down while struggling); Bonet v. Shaw, 669 F. Supp. 2d 300, 305 (W.D.N.Y. 2009) (holding that a use of force was justified after inmate-plaintiff committed "the most unsavory act of spitting in the face of one of the officers").

C.   January 16, 2013 Incident

Plaintiff asserts an excessive force claim based on the extraction that occurred after plaintiff attempted to smuggle contraband into prison.  Plaintiff admits that he was attempting to smuggle a bag of cheese on the date of this incident, but disputes defendants' assertion that he was also trying to smuggle in a contraband weapon.  Plaintiff alleges that the weapon was planted on him by defendant Ryan.  Regardless of this factual dispute, plaintiff's excessive force claim cannot survive given the dipositive video footage of the extraction of plaintiff.  See Boomer v. Lanigan, No. 00-CIV-5540 (DLC), 2002 WL 31413804, at *6 (S.D.N.Y. Oct. 25, 2002) (granting summary judgment on excessive force claim when plaintiff failed to address video evidence that force used during a cell extraction was not excessive).

The video footage of the extraction establishes that defendants used only force that was objectively reasonable to extract plaintiff. See Video of the Extraction Incident. The video footage shows that: (1) plaintiff held his hand in the cuffing port to prevent officers from entering the extraction cell, id. at MOV001, Timestamp 2:27-2:49; (2) defendant Ryan ordered plaintiff to move away from his cell door but plaintiff failed to do so, id.; and plaintiff was ordered not to resist the extraction team but resisted them, id., at MOV001, Timestamp 2:59-5:48. Thus, viewing "the facts in the light depicted by the videotape," plaintiff's account of the incident is irrefutably discredited by the record that "no reasonable jury could ... [believe] him." Scott v. Harris, 550 U.S. 372, 380 (2007).

Furthermore, both parties agree that plaintiff's injuries related to this incident were isolated to "some bruises." Defs.' 56.1 Stmt. ¶ 252. Such injuries are de minimis and insufficient to establish an excessive force claim. See Lemmo v. McKoy, No. 08-cv-4264 (RJD), 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) ("Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising... .") (internal citation omitted). Accordingly, we grant defendants' summary judgment as to plaintiff's excessive force claim arising out of the January 16, 2013 incident.

D.    July 16, 2013 Incident

Plaintiff's final claim of excessive force stems from an incident on July 16, 2013, during which plaintiff and other inmates refused to leave the prison recreation yard.   As discussed supra, plaintiff violates Local Rule 56.1 by asserting a blanket challenge to defendants' recital of the facts subsequent to the assembly of the extraction team.   This blanket challenge is difficult to comprehend given that the contemporaneous video recording of the incident corroborates the following facts from defendants' Rule 56.1 Statement: (1) plaintiff was crouched down on the floor when the extraction team arrived, Video of the Recreation Post Incident, at MOV 00154, Timestamp 4:46-6:14; (2) plaintiff charged out the door and towards the officers when they opened the gate to plaintiff's pen, id. at Timestamp 6:20-6:26; (3) plaintiff got on top of a member of the extraction team and remained on top of that officer for approximately 40 seconds, id. at Timestamp 6:55-7:10; and (4) plaintiff was subsequently handcuffed 90 seconds after he was removed from being on top of the member of the extraction team, id. at Timestamp 7:10-8:45.

Considering the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," and "appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain

27

institutional security," plaintiff's excessive force claim as to this incident cannot survive summary judgment. <u>Kingsley</u>, 135 S. Ct. at 2473. The "severity of the security problem at issue" – inmates refusing to leave the recreation yard for approximately seven hours - necessitated the use of some amount of force to remove plaintiff from the recreation yard. <u>Id.</u> No reasonable jury could conclude that the force used to extract this resisting plaintiff - which resulted in relatively minor injuries including "mild abrasions," "swelling to his eye," and a prescription for Tylenol - was objectively unreasonable. <u>See Kingsley</u>, 135 S. Ct. at 2473 ("extent of the plaintiff's injury" relevant to objective reasonableness assessment); <u>Beauvoir v. Falco</u>, 345 F. Supp. 3d 350, 368 (S.D.N.Y. 2018) ("force that might seem unnecessary in day-to-day civilian life" does not constitute excessive force "so long as the force was tethered to the legitimate need to maintain order in prisons"); <u>G.B. by & through T.B. v. Carrion</u>, No. 09-cv-10582 (PAC)(FM), 2012 WL 13071817, at *18 (S.D.N.Y. Jan. 19, 2012), <u>aff'd sub nom. G.B. ex rel. T.B. v. Carrion</u>, 486 F. App'x 886 (2d Cir. 2012) (constitutional protections against "excessive force do not prevent prison officials from using force in good-faith to keep order"). Accordingly, we grant defendants' motion for summary judgment as to plaintiff's excessive force claim stemming from the July 16, 2013 incident.

**IV.  Other Federal Claims (Counts 2, 4, 11)**

In support of his fourth cause of action, plaintiff conclusorily alleges that defendants engaged in conduct that "shocks the conscience" in violation of his substantive due process rights.  AC ¶ 125-27.  "[T]he substantive due process guarantee of the Fourteenth Amendment protects individuals from 'conscience-shocking' exercises of power by government actors."  <u>Johnson v. Newburgh Enlarged Sch. Dist.</u>, 239 F.3d 246, 252 (2d Cir. 2001). The standard to determine what is "conscience-shocking" is not a bright line test, but abuses of government power "intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience."  <u>Id.</u>  Having rejected plaintiff's claims premised on his prosecution and treatment in prison under standards either equivalent or less demanding than the "conscience-shocking" standard, we grant defendants' motion for summary judgment as to plaintiff's substantive due process claims.  <u>See</u> <u>Edrei v. Maguire</u>, 892 F.3d 525, 537 (2d Cir. 2018) (holding that the "objective reasonable" standard from Kingsley can be used to determine the viability of substantive due process claims premised on alleged use of excessive force); <u>Fappiano v. City of New York</u>, 640 Fed. Appx. 115, 118 (2d Cir. 2016) (substantive due process claim based on denial of fair trial requires that defendants provide "false information likely to

influence a jury's decision and forwards that information to prosecutors" (internal citation and quotation marks omitted)).

Having granted defendants' motion for summary judgment as to Counts 4, 5, and 9, there is no longer a constitutional underpinning for plaintiff's § 1983 claim in Count 2, as § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979). Accordingly, we grant summary judgment as to Count 2.

Similarly, we grant summary judgment as to Count 11 because there is no remaining constitutional claim based on which plaintiff can assert a cause of action for failure to intervene. See Henry-Lee v. City of New York, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) ("[A]n underlying constitutional violation is an essential element of a failure to intercede claim under [section] 1983.").

## V.   Claims against NYC (Counts 3 & 16)

"Monell does not provide a separate cause of action for the failure by the government to train its employees." Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006). Rather, Monell "extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." Id. Because we have found that no individual defendant committed an underlying constitutional violation,

defendants' motion for summary judgment is granted as to plaintiff's claims of excessive force with respect to municipal liability (Count 3) and <u>Monell</u> liability (Count 16).

## VI. Supplemental Jurisdiction over State Law Claims (Counts 4, 7, 8, 12, 13, 14, and 15)

None of plaintiff's federal law claims survives summary judgment, and retention of the remaining state law claims under supplemental jurisdiction is left to the discretion of the Court. 28 U.S.C. § 1367(c)(3); <u>Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.</u>, 464 F.3d 255, 262-63 (2d Cir. 2006). In most cases "in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine — judicial economy, convenience, fairness and comity — will point toward declining jurisdiction over the remaining state-law claims." <u>In re Merrill Lynch Ltd. Partnerships Litig.</u>, 154 F.3d 56, 61 (2d Cir. 1998). In consideration of these factors, we decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted as to plaintiff's federal claims. Because the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims, those claims are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate this case and the pending motions listed at docket entries 77, 98, and 125.

**SO ORDERED.**

Dated:     New York, New York
           March 27, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE